**Gina BURDI, Plaintiff,**

v.

**UNIGLOBE CIHAK TRAVEL, INC., Edward Cihak, Individually and in His Capacity as Owner and President of Uniglobe Cihak Travel, and Uniglobe Midwest Region, Defendants.**

No. 96 C 158.

United States District Court,
N.D. Illinois,
Eastern Division.

July 1, 1996.

John P. De Rose, Kenneth A. Jatczak, John P. De Rose & Associates, Burr Ridge, IL, for plaintiff Gina M. Burdi.

Thomas Joseph Carroll, Chicago, IL, Thomas T. Cavanaugh, Rosemont, IL, for defendants Uniglobe Cihak Travel, Inc., Edward Cihak.

Durga Maheswari Bharam, Tressler, Soderstrom, Maloney & Priess, Chicago, IL, David L. Kabat, Tressler, Soderstrom, Maloney & Priess, Wheaton, IL, for defendant Uniglobe Midwest Region.

## MEMORANDUM OPINION

GRADY, District Judge.

Plaintiff brings suit for alleged violations of 42 U.S.C. § 2000e ("Title VII"), including sexual harassment and sexual discrimination, and also asserts various Illinois state law claims. Defendants have moved to dismiss for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. For the reasons stated in this opinion, the motion is granted.

### BACKGROUND

On approximately March 1, 1989, defendant Edward Cihak ("Cihak"), president of defendant Uniglobe Cihak Travel, Inc., a.k.a. Cihak World Travel, Inc. ("UCT"), entered into a franchise agreement with defendant UniGlobe Midwest Region, a.k.a. Uniglobe Travel (Midwest), Inc. ("Midwest"). Under the terms of that agreement, Midwest operates as the franchisor and UCT operates as the franchisee travel agency.

On approximately January 31, 1992, plaintiff Gina Burdi ("Burdi") was hired by UCT to work as a Corporate Account Executive. According to the complaint, Cihak began touching Burdi and making sexual comments to her shortly after she began working at UCT. Throughout the term of Burdi's employment, Cihak regularly made derogatory and sexual comments to her and rubbed her leg.

On one occasion, in June or July of 1994, Cihak called Burdi into his office, shut the door, pinned her arms to her sides by wrapping his arms around her, and forced his tongue into her mouth. Burdi wrestled out of Cihak's hold, ran out of the office, and told her co-workers what had happened. Later that day, Burdi called Midwest and reported the incident to Robert Stepien ("Stepien"), the Director of Training and Marketing. Stepien advised her to quit her job. A couple of days later, Stepien called Burdi at work to tell her that, because of its serious nature, he had to report her complaint to Robert Roe ("Roe"), president of Midwest. Burdi never heard anything further from anyone at Midwest regarding her sexual harassment complaint.

Cihak continued to touch Burdi and make sexually explicit and derogatory remarks to her. At some point in January 1995 Cihak asked Burdi to come over to his house for dinner because his wife was out of town for the weekend. Burdi angrily declined the invitation. On March 9, 1995, Cihak terminated Burdi's employment, claiming that he could no longer afford her. Neither UCT nor Midwest employed more than ten employees during any month of 1994 or 1995.

### DISCUSSION

When considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, a district court accepts as true all well-pled factual allegations and draws reasonable inferences from the allegations in favor of the plaintiff. *Capitol Leasing Co. v. FDIC,* 999 F.2d 188, 191 (7th Cir.1993). The court may also look beyond the allegations of the complaint and consider affidavits and other documentary evidence to determine whether subject matter jurisdiction exists. *Id.*

Defendants contend that the court lacks subject matter jurisdiction to consider plaintiff's Title VII claim because none of the defendants had enough employees during the relevant time period to meet the statutory definition of "employer." "The term 'em-

ployer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person...." 42 U.S.C. § 2000e(b). Congress limited the applicability of Title VII to entities with fifteen or more employees in order to protect "small entities from the hardship of litigating discrimination claims." *EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1281 (7th Cir.1995).

Defendants have submitted copies of the quarterly unemployment tax contribution reports UCT and Midwest filed with the Illinois Department of Employment Security during the relevant calendar years of 1994 and 1995. These reports show that neither company employed fifteen or more employees during those years. Plaintiff acknowledges this but argues that under one or more of the theories of agency, joint employer, or single entity, the court may add the employee totals for the two companies together to produce a combined total greater than the fifteen employees required for subject matter jurisdiction. In their reply, defendants argue that these theories are inapplicable under the facts of this case, and, further, that even if the employees of the two companies were added together, they would still not add up to fifteen because some of the employees listed on the unemployment tax reports are part-time employees who do not work every day. The parties have not provided sufficient evidence regarding who worked when for the court to be able to determine whom to count and whom not to count, but we need not address that question because we agree with defendants that the theories argued by plaintiff for combining employees are not applicable to the facts.

Before addressing plaintiff's arguments for combining the employee totals of UCT and Midwest, we note that plaintiff has made no allegations or offered any evidence that would permit us to exercise subject matter jurisdiction over Cihak in his individual capacity. The Seventh Circuit has recently held that Title VII's definition of employer, which "includes an employer's agents, is simply a statutory expression of traditional *re-*

*spondeat superior* liability and imposes no individual liability on agents." *Williams v. Banning,* 72 F.3d 552, 555 (7th Cir.1995); *see also, AIC Security,* 55 F.3d at 1279–80 (holding the same in the context of the Americans with Disabilities Act, which uses virtually the same definition of "employer" as Title VII). Agents are liable only if they independently meet the statutory definition of "employer" by, among other things, having fifteen employees. *DeVito v. Chicago Park Dist.,* 83 F.3d 878, 882 (7th Cir.1996).

■ These holdings not only require that the case be dismissed with respect to Cihak, they also mean that if plaintiff's agency rationale for exercising subject matter jurisdiction—over two entities that are not statutory employers—ever had any vitality in the Seventh Circuit, it has none now. Clearly, under the Seventh Circuit's interpretation of the statutory language, neither an agent nor its principal can be liable for a Title VII violation unless each is a statutory employer in and of itself when viewed separately from the other. Therefore, even if plaintiff could establish an agency relationship between UCT and Midwest, we would still lack subject matter jurisdiction.

■ Plaintiff's joint employer theory is similarly flawed. The only case plaintiff cites in support of this theory is *Magnuson v. Peak Technical Servs.,* 808 F.Supp. 500 (E.D.Va.1992), but this case does not stand for the proposition that entities not meeting the statutory definition of "employer" can nevertheless become liable under Title VII by being combined with each other. *Magnuson* recognizes that more than one employer can be liable to an individual under Title VII if they each " 'control some aspect of an individual's compensation, terms, conditions, or privileges of employment.' " *Id.* at 507–08 (quoting *Spirt v. Teachers Ins. & Annuity Ass'n,* 475 F.Supp. 1298, 1308 (S.D.N.Y. 1979)). *Magnuson* also recognizes, however, that before an entity can become liable as a joint employer under Title VII, it must first "fall within Title VII's statutory definition of 'employer.' " *Magnuson,* 808 F.Supp. at 507.

■ Plaintiff's single entity theory has more merit and recognition in the Seventh

Circuit than either of the other two theories. Under this theory, which was originally recognized in the area of labor relations, two nominally separate but interrelated business entities can be considered to be a single entity. *Rogers v. Sugar Tree Prods., Inc.*, 7 F.3d 577, 582 (7th Cir.1993). To determine whether a single employer exists, we must consider the following factors:

> "(1) Interrelation of operations, *i.e.* common offices, common record keeping, shared bank accounts and equipment.
>
> (2) Common management, common directors and boards.
>
> (3) Centralized control of labor relations and personnel.
>
> (4) Common ownership and financial control."

*Id.* (quoting *York v. Tennessee Crushed Stone Ass'n*, 684 F.2d 360, 362 (6th Cir.1982). Common control of labor relations is the most important of these factors, but "the presence or absence of any one factor is not controlling." *Rogers*, 7 F.3d at 582.

The affidavits submitted by both sides and the franchise agreement between UCT and Midwest establish that the two companies have separate offices, bank accounts, management and ownership. It is only with respect to whether Midwest exerted financial control over UCT, over UCT's employees, and over UCT's relations with its employees, that plaintiff has made the slightest showing. In her affidavit, Burdi states that various UCT employees were required to attend sales and productivity meetings at the Midwest office as often as every other week. She further states that Stepien, Midwest's Director of Training and Marketing, accepted her complaints of sexual harassment against Cihak and reported them to Roe, Midwest's president.

However, the type of financial control that these facts indicate Midwest has over UCT is not the type of control that would make the two separate companies a single employer. "A 'single employer' situation exists 'where two nominally separate entities are actually part of a single integrated enterprise.'" *Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir.1985) (quoting *NLRB v. Browning–Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1123 (3d Cir.1982)). The single employer situation "is characterized by absence of an 'arm's length relationship found among unintegrated companies.'" *NLRB v. Al Bryant, Inc.*, 711 F.2d 543, 551 (3d Cir.1983) (quoting *Local No. 627, Int'l Union of Operating Eng'rs v. NLRB*, 518 F.2d 1040, 1045–46 (D.C.Cir.1975)). Thus, two companies were a single employer where they had overlapping ownership and managerial control, and were "functionally integrated" by virtue of the fact that the garments manufactured by the one company were exclusively sold to and marketed by the other company. *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 747 (2d Cir.1996). But two companies that were in a franchisor-franchisee relationship where the franchisor's only real control over the franchisee was the franchisor's power to terminate the franchise were not a single entity. *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090 (10th Cir.1991). Plaintiff has presented no evidence indicating that the relationship between Midwest and UCT is anything other than an arm's length, contractual, franchisor-franchisee relationship. Midwest, like McDonald's in *Evans*, may have "stringently controlled the manner of its franchisee's operations, conducted frequent inspections, and provided training for franchise employees," *Evans*, 936 F.2d at 1090, but Midwest had no direct control over UCT's operations as would be found in an integrated enterprise.[1] Therefore, we may not exercise subject mat-

---

1. Although a franchisor's authority to terminate the franchise for cause might seem to give it the power to bring about a cessation of sexual harassment, this assumes the unlikely event that the franchisee would admit that the harassment was taking place and that it was expected to continue. Assuming that sexual harassment of an employee would constitute "cause" for termination (and thus for elimination of the place of employment as well as the harassment), the more likely scenario is that the franchisee would deny the harassment. The franchisor is not in a position to make a credible threat of termination in situations where the employer denies it is occurring. It lacks the authority to conduct a thorough investigation of the facts in order to determine where the truth lies, and if it were to terminate the franchise on the strength of the employee's accusation, it would simply be buying a breach of contract lawsuit by the franchisee.

ter jurisdiction over UCT and Midwest as a single employer.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss for lack of subject matter jurisdiction is granted.